OPINION.
Scofield, J.,
delivered the opinion of the court:
In 1878 claimant entered the Naval Academy at Annapolis as a cadet-engineer. June 9, 1882, having completed the prescribed term of four years and successfully passed the final academic examination, he received the usual “diploma” or “certificate of proficiency,” and was thereupon detached from the Academy by order of the Secretary of the Navy. Thereafter he was placed upon the Navy Register as a “ graduate,” and became entitled to receive, and, until December 11, 1882, did receive, the increased rate of pay provided for in section 1556 of the Revised Statutes. After that date his pay was reduced to $500 a year. This reduction was based upon a construction put upon some *555 portions of the Naval appropriation Act of August 5, 1882 (22 Stat. L., 286), by the Navy Department, and adopted by the accounting officers of the Treasury. By this construction cadet-engineers who had completed their academic course in 1881 and 1882 were transformed into “ naval cadets.” Claimant, unwilling to abide by this interpretation of the law, in order to obtain, if possible, a judicial construction, brings this suit, nominally, as it is said, to recover the small amount of withheld pay.
Cadet-midshipmen, whose academic course in preparation for the duties of the “line” was required to be six years (Bev. Stat., 1520), and cadet-engineers whose “course of instruction” in preparation for the duties of the Engineer Corps was required to be “ four years at the Academy” and “ two years’ service in naval steamers,” were, prior to the act of August 5, 1882, educated, under their respective titles, for their prospective and respective duties in the Naval Academy at Annapolis. They were paid as follows:
Midshipmen, after graduation, -when at sea, one thousand dollars; on shore duty, eight hundred dollars; on leave, or waiting orders, six hundred dollars.
Cadet-midshipmen, five hundred dollars.
Cadet-engiheers: Before final academic examination, five hundred dollars after final academic examination, and until warranted as assistant engineers, when on duty at sea, one thousand dollarson shore duty, eight hundred dollars; on leave, or waiting orders, sixhundred dollars. (Eev. Stat., § 1556.)
Cadet-midshipmen, during such period of their course of instruction as they shall be at sea in other than practice-ships, shall recen e as annual pay not exceeding $950. (Richardson’s Suppl. to Bev. Stat., 294.)
' The following extracts from the Act of August 5,1882, ch. 391 (22 Stat. L., 286), includes all that is supposed to affect this case:
For pay of the Navy, for the active list, namely: * * * sixty-nine chief engineers, one hundred passed assistant engineers, thirty-five assistant engineers, seventy-three cadet-engineers (graduates), * * * one hundred and two cadet-engineers, one hundred and thirty cadet-midshipmen (not graduates); in all, four million forty-eight thousand three.hundred dollars.
Provided, That hereafter there shall he no appointments of cadet-midshipmen or cadet-engineers at the Naval Academy, but in lieu thereof naval cadets shall bo appointed from each Congressional district and at large, as now provided by law for cadet-midshipmen, and all the under-graduates at the Naval Academy shall hereafter be designated and called ‘1 naval cadets; ”
And from-those who successfully complete the six years’ course, appoint- *556 monts shall hereafter be made as it is necessary to fill vacancies in the lower grades of the line, and Engineer Corps of the Navy and of the Marine Corps:
And provided further, That no greater number of appointments into these grades shall be made each year than shall equal the number of vacancies which has occurred in the same grades during the preceding year; such appointments to be made from the graduates of the year, at the conclusion of their six years’ course in the order of merit, as determined by the Academic Board of the Naval Academy; the assignment to the various corps to be made by the Secretary of the Navy, upon the recommendation of the Academic Board.
But nothing herein contained shall reduce the number of appointments from such graduates below ten in each year, nor deprive of such appointment any graduate who may complete the six years’ course during the year eighteen hundred and eighty-two. And if there be a surplus of graduates, those who do not receive such appointment shall be given a certificate of graduation, an honorable discharge, and one year’s pay, as now provided by law for cadet-midshipmen. * * *
* * * That the pay of naval cadets shall be that now allowed by law to cadet-midshipmen; and as much of the money hereby appropriated as may be necessary during the fiscal year ending June thirtieth, eighteen hundred and eighty-three, shall be expended for that purpose. *■ * *
That no officer now' in the service shall be reduced in rank of deprived of his commission by reason of any provision of this act reducing the number of officers in the several staff corps: Provided, That no further appointments of cadet-engineers shall be made by the Secretary of the Navy under section three of the act of eighteen hundred and seventy-four.
Tbe accounting officers held that under the first proviso in the second paragraph of this law cadet-engineers who had completed their academic course in 1881 and 1882, but had not yet had “ two years’ service on naval steamers,” were still, to be considered “undergraduates” at the Naval Academy, and so became under this law “ naval cadets,” entitled to pay only at the rate of $500 a year. The claimant and the other cadet-engineers, on the contrary, contend that after completing their academic course and receiving diplomas or certificates of proficiency, their connection with the Academy was entirely severed; that they then became “graduates,” and could in no sense be considered “undergraduates at the Naval Academy.”
Upon, the meaning of these two words, graduates and undergraduates, as used in the statutes, the question in dispute must be mainly settled. That these terms might liave been applied technically either to the academic graduation or the completion of “ two years’ service in naval steamers ” may well be admitted. The question to be settled is, not how they might have been property applied, nor even how they were applied in Navy eir- *557 cles, but to which period of time Congress intended to apply them in this act.
question it should not be forgotten that the two additional years required to fill up the six-year course of cadet-engineers are not years of study, but of “service." They do not go to sea in practice-ships, nor in other ships, in large numbers, mainly for educational purposes. They are not subject to academic orders, nor are they expected to pursue ■academic studies, but to take charge of and run the engines. Their school exercises are ended and their life-work begun. They are as much in the service and as subject to all its requirements as they ever will be. Wlien at. the end of the two years— or rather at the end of a cruise, which may last three years or more — they are examined, it is for promotion only. This examination is not at the Academy nor before the Academic Board, but is the same kind of an examination that every officer, at each step in his advancement, is required to undergo. So emphatically does the law consider these two years as years of service that it doubles the pay.
In the universities the students who have honorably passed through the prescribed course of study and received certificates to that effect are known and catalogued as graduates. According to the dictionaries, it is a proper designation.' Cadet-engineers who have successfully completed their academic course, passed the closing examination, and received from the Academic Board certificates to that effect, have hitherto been called in Navy parlance “ graduates.” In the official Navy Register, revised and published twice a year, they are ranged under the head of “Graduates.” Under the head of “Date of graduation” the time when they left the .Academy is given. Under the head of “Sea service since graduation”, all sea service after leaving the Academy is recorded. Congressmen, especially those on naval committees, become familiar with these Registers. As every Representative in the House nominates a cadet at the Academy, and naturally takes a deep interest in him and the institution, this classification and designation could scarcely escape his attention. Under these circumstances it is not unfair to presume that in using the terms graduate and undergraduate Congress followed the definition of the schools, the dictionaries, and the Navy Register.
But in arriving at the meaning attached to these words by *558 Congress we are not entirely dei>endent upon this presumption. Tlie word “graduate” is twice used in this very law, where, by the connection, its legislative meaning cannot be mistaken. First, in making an appropriation for the pay of these cadet-engineers, to distinguish them from others still in the Academy, it calls them “graduates.” Second, in these words, “nor deprive of such appointment any graduate who may complete the six years’ course in 1882.” If “any graduate” means a cadet who had already completed a six years’ course, it makes very clumsy tautology.' It would be the same as to say “ a graduate who may become a graduate in 1882.” It doubtless refers to cadet-engineers who graduated at the Academy in 1880, and whose two-years’ term of sea-service would expire in 1882.
The Naval appropriation Act of March 3, 1883, ch. 97 (22 Stat. L., 472), shows very clearly how Congress construed its own act. It makes an appropriation for the pay of sixty-two cadet-engineers. By referring to the Navy Register of July, 1882, it appears that this is the exact number of cadet-engineers who had graduated at the Academy, but were not yet eligible to promotion, or whose promotion had been delayed. It includes the classes of 1880,1881, and 1882. The act then appropriates for the pay of three hundred and thirty-five naval cadets. These constitute the “undergraduates” of the Act of August 5, 1882. It is probably the number of cadet-engineers actually at the Academy added to the number of undergraduate cadet-midshipmen. If Congress had concurred in the defendants’ construction of the law, they, would have made a single appropriation for three hundred and ninety-seven naval cadets. This amounts to a legislative construction of the Act of August 5, 1882. (United States v. Freeman, 3 How., 556.)
In arriving at the meaning of the law, the words “at the Academy,” following “undergraduates,” should not be overlooked. They are words of more definite description, added apparently to preclude all doubt as to what cadets were designated as “undergraduates.” It seems very conclusive of the intention of Congress. It is said, in avoidance of it, that in contemplation of law these graduates, although scattered all over the world, might still be considered “undergraduates at the Academy.” It may, with some propriety, be said that cadet-midshipmen who are sent to sea mainly for instruction, and who return to the Academy at the termination of the cruise for the *559 final graduating examination, are in legal contemplation all tbe time “at tbe Academy.” But cadet-engineers wbo have received tbeir graduation certificates from tbe Board, and, by order of tbe Secretary of tbe Navy, bave been forever “detached” from tbe Academy and sent into actual service, in war steamers over all tbe seas, and are never required to return to that institution, can hardly, even in legal fiction, be considered as still “ at the Academy.”
Tbe theory is too intangible to constitute a controlling element in tbe construction of tbe law.
In support of tbe defendants’ position it is said that tbe words graduate and undergraduate might be properly employed to designate either of two events, to wit, graduation at tbe Academy or final graduation after twd years of sea-service. Graduation would scarcely be an apt word to indicate tbe close of two years’ service. From what would they then graduate? Certainly not from sea-service; that continues without change. Not from tbe grade of cadet-engineers, for they do not graduate from that until vacancies occur in the grade above. In tbe Navy Begulations tbe word is once used in tbe sense of defendants’ construction, but even there it is connected with tbe word “finally,” indicating that there has been' a prior graduation at tbe Academy. But the question is not whether in some technical sense undergraduate and graduate might be applied to tbe ending of tbe two years’ service, but1 whether they were so applied by Congress in tbe act under consideration.
It is also suggested by tbe counsel for tbe defendants that tbe protection given to tbe claimant and bis associates by this construction of tbe law would be of short duration, Because upon tbe completion of tbe six years’ course, under tbe surplus graduate clause, they must all be discharged. By a careful examination of this clause it will be seen that tbe classes of 1881 and 1882 are not embraced within it. Being entirely prospective in character, it applies only to tbe surplus of naval-cadet graduates.
It is further said in objection that tbe act makes no provision for tbe promotion of tbe classes of 1881 and 1882. They must remain, so long as this act is in force, as cadet-engineers. This may perhaps be tbe case, but in tbe judgment of tbe claimant, and presumably of bis classmates, that position is better than tbe one to which tbe defendants’ construction would consign *560 them; for by that construction they are at once reduced one-lialf in pay, and ordered to an examination in branches of naval education, to which they have given little or no attention, in competition with cadet-midshipmen, who, for six years, under able instructors, have made these branches a special study. Under such disadvantage it is not strange that they anticipate failure. In that event they leave the service Avith mortification to themselves, and to the outside world with apparent though undeserved discredit. Admitting, however, that the hardship of these young men would be somewhat mitigated by the defendants’ position, the court would not for this reason be justified in giving its sanction to a construction whereby the intention of Congress, somewhat obscure in a cursory reading, but upon a careful examination too plain for unbiased mistake, is entirely ignored. We cannot agree to the ruling of the accounting officers of the Treasury, and therefore direct judgment to be entered in favor of the claimant in the sum of $50.50.
Note. — A motion for a new trial was made on behalf of the defendants, and after full argument on the whole case by Mr. Thomas Simons, Assistant Attorney-General, and Mr. F. R. Rowe, in support of the motion, and by Mr. George L. Douglass against it, was overruled by the court, June 11, 1883.